UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

_____

In Re:

Donald Tietz                                         Bankruptcy No. 17-60377-MER
Coleen Tietz,                                        Chapter 7

       Debtors.

_____

**NOTICE OF HEARING AND MOTION FOR RELIEF FROM AUTOMATIC STAY**

TO:   The Debtors and other entities specified in Local Rule 9013-3(a):

1.      Community Development Bank (the "Bank"), a secured creditor in the above bankruptcy by its undersigned attorneys moves the Court for the relief requested below and gives notice of hearing herewith.

2.      The Court will hold a hearing on this Motion on **Tuesday, May 1, 2018, at 1:00 p.m.,** or as soon thereafter as counsel can be heard, before the Honorable Michael E. Ridgway at the U.S. Courthouse, 118 South Mill Street, Fergus Falls, MN 56537.

3.      Any response to this motion must be filed and delivered not later than **April 26, 2018**, which is five (5) days before the time set for the hearing (including Saturdays, Sundays, and holidays).   **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

4.      This Motion arises under 11 U.S.C. § 362 and Federal Rule of Bankruptcy Procedure 4001.  This Motion is filed under Federal Rule of Bankruptcy Procedure 9014 and Local Rules 9006-1, 9013-1 through 9013-3.  The Bank seeks relief from the automatic stay of 11 U.S.C. § 362 in order to enforce its rights as a secured creditor respecting an assignment of insurance and, as necessary, to foreclose its real property collateral, all as more specifically provided for herein.

5.      The petition commencing this Chapter 7 case was filed on June 22, 2017 and the case is now pending in this Court.  This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 1334 and 157(a), Fed. R. Bankr. P. 5005 and Local Rule 1070-1.  This is a core proceeding.

6.      Don Tietz Construction, Inc. (the Company) has the following loan with the Bank:

> On or about May 7, 2012, for value received, the Company made, executed and delivered to the Bank a Promissory Note in the original principal amount of $350,000.00.  A true copy of the Note is attached as **Exhibit A.**  The Company is a debtor in a related chapter 7 case (Case No. 17-60441).

7.      Debtor Donald Tietz and a non-debtor third party guaranteed the foregoing loan. A true copy of the Guaranty is attached hereto as **Exhibit B.**

8.      To secure the loan guaranty in part, Debtors executed and delivered to the Bank the following Mortgage:

> Mortgage dated May 7, 2012, filed for record in the Office of the Becker County Recorder, State of Minnesota on May 11, 2012 as Document No. 597302.

A true copy of the Mortgage is attached hereto as **Exhibit C**.  The real property secured by the foregoing Mortgage is commonly known as 23865 250th Street, Detroit Lakes, MN 56501.

9.      In connection with the foregoing loan, Debtors and others executed or consented and agreed to as applicable to a Loan Modification and Forbearance Agreement dated April 30, 2016 as amended in October of 2016.  True copies of the Agreement and Amendment are attached as **Exhibits D and E**, respectively.  Among other things, the Agreement provided for an assignment of life insurance on Donald Tietz as security for the loan guaranty.  A true copy of the assignment of Northwestern Mutual Insurance Policy No. ****3910 is attached as **Exhibit F**.

10.     After all extensions and amendments, the subject loan has matured and is in default.  The loan is presently outstanding in the following amount: $10, 367.97 as of March 23,

2

2018 together with further interest of 6.25%, costs and disbursements as well as reasonable attorney fees, all as provided for in the loan documents.  The Bank is an over-secured creditor. The insurance policy assignment has a value at least equal to the sums due the Bank, and Debtors value the real estate at $8,000.00 (includes additional acreage) in their schedule A.

11.     Pursuant to 11 U.S.C. § 362(g), the burden is on the Debtors to prove absence of cause and/or adequate protection.  The Bank's interest in the real property is not adequately protected and cause exists for relief from the automatic stay. For whatever reason, no discharge has been entered in this case which has been pending for many months.  The Bank's equity cushion will erode with the passage of time.  Further, this being a Chapter 7 case, the property is not necessary for an effective reorganization.  Upon information and belief, the Debtors do not oppose this motion for stay relief.

**WHEREFORE**, the Bank by its undersigned attorneys moves the Court for an Order that the automatic stay provided by 11 U.S.C. § 362(a) be terminated to permit the Bank to enforce its rights as a secured creditor with regard to the insurance assignment described above and as necessary to commence and complete foreclosure of its Mortgage respecting the subject real property pursuant to its loan documents and under applicable law, as well as for such other relief as may be just and equitable.

Dated this 16th day of April, 2018.


JONATHAN FAY, P.C.


By:     /e/  Jonathan R. Fay
        Jonathan R. Fay, ID #173721
        P.O. Box 764
        Detroit Lakes, MN 56502-0764
        (701) 293-9190
        jack@jfaylaw.com
        Attorneys for Community Development
        Bank

3

## VERIFICATION

The undersigned officer of Community Development Bank declares under penalty of perjury that the foregoing is true and correct, to the best of his knowledge, information and belief.

**Community Development Bank**
*FSB*

# PROMISSORY NOTE

| Borrower(s): | Lender: |
|---|---|
| **Don Tietz Construction, Inc.**<br>23865 250th St.<br>Detroit Lakes, MN  56501 | **Community Development Bank**<br>P.O. Box 38<br>Ogema, MN  56569 |

*pmt # 133*

| Loan Number: | Loan Amount: | Note Date: | Maturity Date: |
|---|---|---|---|
| | 350,000.00 | May 7, 2012 | May 5, 2022 |

**FOR VALUE RECEIVED**, the undersigned (each a "Borrower") unconditionally (and jointly and severally, if more than one) promise(s) to pay to the order of Lender or the holder hereof ("Lender") at the address set forth above, or at such other location as Lender may designate, the principal sum of **Three Hundred Fifty Thousand and 00/100**
_____ Dollars ($ **350,000.00** ), or such lesser principal sum as may have been advanced hereunder, together with interest from the date hereof on the unpaid principal balance hereunder, computed daily, at the RATE per annum indicated below and in accordance with the particular PAYMENT SCHEDULE and other terms indicated below:

☒ **SINGLE ADVANCE:** Borrower has received the entire principal amount. No additional advances will be available.
☐ **MULTIPLE ADVANCE:** The principal shown above is the maximum amount which Borrower can borrow. On _____, _____, the Lender will make an initial disbursement to Borrower of $_____ and will make future advances as set forth below.
  ☐ **OPEN-END CREDIT (REVOLVING):** Borrower may borrow up to the maximum principal amount more than one time until _____.
  ☐ **CLOSED-END CREDIT (NON-REVOLVING):** Borrower may borrow up to the maximum principal amount only once.
**CONDITIONS:** The conditions for future advances are _____
_____
_____

**INTEREST:** Borrower agrees to pay interest on the principal from the date of disbursement to the date of payment and/or maturity at a rate equal to:
☐ **FIXED RATE:** a Fixed Rate of _____%.
☒ **VARIABLE RATE:** An **initial** Interest Rate of _____ **5.500** % PER ANNUM that may change as stated below:
**FREQUENCY AND TIMING:**
The interest rate on the loan may change **without further notice to Borrower** beginning _____**May 5, 2013**_____ and changing _____**annually**_____ thereafter. Each date on which the interest rate could change is called a "Change Date". Each such change shall be effective on the Change Date and the new interest rate, subject to any limitations below, shall remain the interest rate until the next Change Date.
**INDEX:**
☒ Beginning with the first Change Date, the interest rate will be based on an index. The "Index" is **New York Prime Rate as published in the Wall Street Journal**
_____
_____
☐ Beginning with the first Change Date, my interest rate will not be based on any internal or external index. It will be entirely in the Lender's control.
**CALCULATION OF NEW INTEREST RATE:**
☒ The interest rate effective on each Change Date will be _____ **2.250% above** _____ the then current Index.
☒ The new interest rate will be rounded **to the nearest 0.125%** .
**LIMITATIONS:**
☒ The applicable annual interest rate will be no more than _____ % or less than _____ **5.000** %.
☐ The rate may not change more than _____ % at each Change Date.
The interest rate combined with any other charges shall never exceed the highest interest rate allowed by law.
**EFFECT OF THE VARIABLE RATE:**
Changes in the interest rate will have the following effect on payments:
☒ The amount of each scheduled payment will change.
☒ The amount of the final payment will change.

**ACCRUAL METHOD:** Interest will be computed on the basis of _____ **Actual/365** _____ .

**DEFAULT RATE:** Borrower will pay interest on the unpaid balance of this note after maturity, whether by passage of time, default, acceleration, or upon demand (if applicable), until paid in full at
☐ _____ percent ( _____ %) per annum.
☒ on the same fixed or variable rate basis in effect before maturity (as indicated above).

**PAYMENTS:** Borrower agrees to pay this Note as follows:
Payable in _____ **119** _____ principal and interest payments beginning _____**June 5, 2012**_____ and _____**Monthly**_____ thereafter. A final payment of the unpaid principal plus accrued interest shall be due and payable on the Maturity Date.

☐ **BALLOON PAYMENT:** This note requires a balloon payment of all amounts due to be paid in full on _____

© Creative Thinking, Inc. 2004            Page 1 of 2            Initials
16689.CV (8/11)    CML58                                                    **Non-Consumer Transaction**



GOTO(00049b8b)

**EX A**

☒ **LATE CHARGE:** If payment is more than __15__ days late, Borrower agrees to pay the following late charge:
☒ Equal to ____ **5.000** % of the payment.
☐ _____ of $ _____ or _____ % of the payment.
☐ Equal to $ _____.

**PREPAYMENT PENALTY:**
☒ Borrower may prepay this Note in whole or in part at any time without penalty.  Prepayments will be applied to the last payments due on the note and will not excuse you from making the next regularly scheduled payments.
☐ If this Note is paid off early, Borrower agrees to pay a penalty fee of $ _____.  Prepayments will be applied to the last payments due on the note and will not excuse you from making the next regularly scheduled payments.
☐ _____
_____
_____

☒ **SECURITY:** This note is secured under separate agreements as follows (Description and Date):
**SEE SECURITY AGREEMENT DATED 05/07/2012**
**SEE MORTGAGE DATED 05/07/2012**

**APPLICATION OF PAYMENTS:**  All payments made will be applied first to interest accrued, then to principal, and then to late charges.  Interest accrues on each advance of principal from the date when made to the date when paid in full.

**DEFAULT:**  Borrower will be in default if (1) any payment is not received by Lender by the close of business on the date when due; (2) Borrower fails to keep any other promise or commitment to Lender; (3) Borrower uses the proceeds in a manner which violates state or federal law; (4) Borrower dies, declares bankruptcy, or becomes incompetent, or if Borrower is an entity dissolves or otherwise loses its authority to conduct business; or (5) Borrower furnishes Lender with any information which is not true.  If Borrower is in default and after any notice which might be required under applicable law, Lender may at its option declare all amounts due or to become due hereunder to be immediately due and payable in full, and Lender shall be entitled to immediately pursue any rights or remedies Lender may have under applicable law or in equity or under any security documents or guaranties related to this note, if any, including rights of set-off in such order or at such time as Lender may determine in its sole discretion.  To the extent permitted by applicable law, Borrower agrees to pay and Lender may recover all costs, expenses, and reasonable attorneys' fees incurred in enforcing the note after default.

**NOTICE:**  Any notice to Borrower is sufficiently given if mailed postage prepaid to the address set forth above by U.S. First Class Mail, or by any other method of delivery by courier, facsimile transmission, or electronic mail reasonably calculated to bring it to Borrower's attention. Borrower will notify Lender if Borrower changes their residence address, mailing address, or registered office.

**GENERAL:**  Borrower hereby waives presentment for payment, demand for payment, notice of default or nonpayment, protest, notice of protest, notice of dishonor or any other notice except when notice is required by law and consents to release, substitution or impairment of collateral or security, if any and extensions or modification of the terms of this note at Borrower's discretion.  No act, omission, delay or failure to proceed with diligence to enforce this note shall constitute a waiver of any of Borrower's rights or remedies. Time is of the essence of this note.  This note cannot be modified or amended except in a writing signed by Borrower and Lender.

If more than one person signs this Note as a Borrower, then Borrower refers to each such person separately, and this Note may and the promises and agreements may be enforced against all Borrowers or any Borrower separately. This note shall be governed by the law of the state of Lender's address set forth above.

**PURPOSE:** refinance business _____

**Don Tietz Construction, Inc.**

By: _Donald D Tietz (signature)_____
**Donald D. Tietz, President**

_____

By: _Jason Coley (signature)_____
**Jason Coley, General Partner**

_____

By: _____

_____

By: _____

_____



**Community
Development Bank
FSB**

# GUARANTY OF PAYMENT
# (GENERAL)

In consideration of any and all loans, advances, acceptances, discounts and extensions of credit made by
**Community Development Bank** _____ whose address is
**P.O. Box 38  Ogema, MN  56569** _____ (hereinafter "Lender"),
to, for the account of, or on behalf of **Don Tietz Construction, Inc.** _____

_____ whose address is
**23865 250th St  Detroit Lakes, MN  56501** _____ (hereinafter "Borrower"),
and as an inducement for Lender to make future loans, advances, acceptances, discounts and extensions of credit to
the Borrower, the undersigned (hereinafter, whether one or more referred to as  "Guarantors" or "Guarantor")
hereby jointly and severally, absolutely and unconditionally guaranty to the Lender the prompt payment in full of
the principal, interest and any other existing or hereinafter incurred sums due from Borrower to Lender at any time
(it being understood and agreed that this Guaranty is a continuing one).  This guaranty covers all of Borrower's
debts and obligations to Lender, whether they are direct or indirect, liquidated or unliquidated, fixed or contingent,
or otherwise guaranteed or secured, and whether on an open account or evidenced by a note, draft, check or other
instrument or document, and all taxes, fees, charges, expenses, attorneys' fees and costs incurred by Lender in
connection with any indebtedness of Borrower or in enforcing or attempting to enforce this Guaranty (all of these
obligations, indebtedness, and liabilities are hereinafter collectively referred to as "Indebtedness".).

This Guaranty is (mark as applicable):

_____  Unsecured.

__X__  Secured by a mortgage or security agreement dated **May 7, 2012** _____.

_____  Secured by _____.

Guarantors expressly waive the following:  Notice of the incurring of Indebtedness by the Borrower; the
acceptance of this Guaranty by Lender; presentment and demand for payment, protest, notice of protest, and notice
of dishonor or non-payment of any instrument evidencing Indebtedness of Borrower; any right to require suit against
Borrower or any other party before enforcing this Guaranty; any right to have security applied before enforcing this
Guaranty, any right of recourse to or to participate in any collateral or security given to Lender to secure payment of
the Indebtedness; and any right of subrogation to Lender's rights against Borrower until Borrower's Indebtedness to
Lender is paid in full.

Guarantors hereby consent and agree that, without notice to Guarantors and without in any manner
affecting any Guarantor's liability hereunder, Lender may grant one or more renewals and extensions of time for
payment of any Indebtedness; may surrender, release, exchange, substitution, deal with, or repossess, sell, lease,
dispose of, add collateral securing repayment of Indebtedness; may take or release other guaranties of all or part of
the Indebtedness; may release  any of the Guarantors hereunder; may abstaining from taking advantage of or
realizing upon any collateral securing any of the Indebtedness  or other guaranties; may impairment of collateral
security;  and may grant any and all other forbearances or indulgences to Borrower or any other party  in its sole
discretion.

If any of the following events occur, time being of the essence of this agreement then or at any time
thereafter, while such events continue, Lender may declare all Indebtedness together with all obligations of
Guarantors, to be immediately due and payable, and at Lender's election, Guarantors shall promptly pay to Lender
the entire amount of said Indebtedness, and Lender may take any action deemed necessary or advisable to enforce
this Guaranty:  1) Any default with respect to   payment or performance of Borrower's Indebtedness when due or
any failure of Borrower to otherwise perform any obligations when due to Lender under the Indebtedness or related
loan and security documents; 2) default in the Guarantors' observance or performance of any covenant or agreement
set forth either in this Guaranty or in any mortgage deed, security agreement or any other document or instrument
delivered in connection with this Guaranty or securing performance by the Guarantors; 3) insolvency of any of the

GOTO(00049b8c)

Ex B

Guarantors or of Borrower; 4) Borrower or any of the Guarantors makes an assignment for the benefit of creditors or commences or has commenced against them a proceeding in bankruptcy or for reorganization or to effect a plan or arrangement with creditors; 5) Borrower or any of the Guarantors applies for or permits the appointment of a receiver or trustee for any or all property or assets of any of the Guarantors or of Borrower, or any such receiver or trustee shall have been appointed for any or all property or assets of the Guarantors or of Borrower; 6) a proceeding is filed or commenced by or against any of the Guarantors or Borrower for dissolution or liquidation; 7) Borrower or any of the Guarantors die (if an individual) or voluntarily or involuntarily terminates or dissolves or is terminated or dissolved; or 8) there is a material change in the financial status of any of the Guarantors or Borrower.

If Lender should sell, transfer, discount or assign all or any portion of or interest in any Indebtedness covered by this Guaranty, with or without recourse, then this Guaranty shall extend to and inure to the benefit of the transferee or assignee of any such Indebtedness so transferred, sold or assigned, and any such assignee or transferee shall have the same right or rights, claims, privileges and causes of action as granted to Lender by this Guaranty.

All existing or future accounts, deposits and property of Guarantors with or in the hands of the Lender shall be pledged as additional collateral security for the Indebtedness of the Borrower, and Lender shall have the same right of set-off with respect to the deposits and other credits of the Guarantors as it has with respect to deposits and other credits of Borrower.

If Guarantor is a corporation, a limited liability company or a partnership, Guarantor represent that it is validly existing and is in good standing under the laws of the jurisdiction of its formation or organization and has the requisite power and authority to execute, deliver and perform this Guaranty, and that the execution, delivery and performance of this Guaranty has been duly authorized by all requisite action by or on behalf of Guarantor and will not conflict with, or result in a violation of, or a default under its articles of incorporation or bylaws, the limited liability company operating agreement, or the partnership agreement of Guarantors, as the case may be.

Any failure to or delay in exercising any rights hereunder by Lender shall not operate as a waiver of such rights. Any lack of notice or demand given to Guarantors shall not be deemed to be a waiver of any obligation of the Guarantors or of the right of Lender to take further action without notice or demand as provided herein. In any event, no modification or waiver of the provisions hereof shall be effective unless in writing and signed by Lender.

Guarantors agree to provide Lender with such information concerning their financial condition, assets, liabilities, income and cash flow as Lender may request from time to time. Guarantors assume all responsibility for being and keeping themselves informed of Borrower's financial condition and of all other circumstances bearing upon the risk of Borrower's nonpayment of the indebtedness. Guarantors agree that Lender shall have no obligation or duty to advise Guarantors of any information known to Lender regarding such condition or circumstances.

This Guaranty constitutes the entire agreement between Guarantors and Lender with respect to the subject matter hereof. No term or provision of this Guaranty may be amended, modified or waived except pursuant to a written document duly executed by Guarantors and Lender.

This Guaranty is a continuing guaranty and it shall remain and continue in effect until Lender receives written notice of the revocation of this Guaranty from a Guarantor, but such revocation shall not in any way affect the liability of any other Guarantors, or of the liability of the Guarantor giving notice with respect to any Indebtedness in existence at the time of Lender's receipt of such notice or with respect to any renewals or extensions of such Indebtedness.

The terms "Guarantors" and "Borrower" and any pronouns referring thereto shall be construed in the masculine, feminine, singular or plural as the context may require. In addition, "Guarantors" and "Borrower" may refer to a natural person or persons, a corporation, partnership, limited liability company, or any other entity as the context may require.

© Creative Thinking, Inc. 2004
15562.CV (11/06)    CML58

GOTO(00049b8e)

This Guaranty shall be binding upon the Guarantors and their respective heirs, executors, administrators, successors, and assigns, and shall be governed by and construed in accordance with the laws of the State of Lender's location set forth above.

Each Guarantor hereunder is jointly and severally liable for the entire amount of the Indebtedness. Guarantors each acknowledge that their obligations are not conditioned upon the execution of this or any similar guaranty by any other person. Each Guarantor waives any right of contribution from any other Guarantor or surety until the Lender is paid in full as to all Indebtedness guaranteed hereunder.

NOTICE:   A credit agreement must be in writing to be enforceable. To protect you and us from any misunderstandings or disappointments, any contract, promise, undertaking, or offer to forebear repayment of money or to make any other financial accommodation in connection with this loan of money or grant or extension of credit, or any amendment of, cancellation of, waiver of, or substitution for any or all of the terms or provisions of any instrument or document executed in connection with this loan of money or grant or extension of credit, must be in writing to be effective.

Dated this ___7th___ day of ____May____ , ___2012___ .

**If individual Guarantor(s):**

_Donald D. Tietz_ (signature)
Individual Guarantor **Donald D. Tietz**

**23865 250th St  Detroit Lakes, MN  56501**
Address

_Jason Coley_ (signature)
Individual Guarantor **Jason Coley**

**23657 Upsala Church Road  Detroit Lakes, MN  56**
Address

_____
Individual Guarantor

_____
Address

_____
Individual Guarantor

_____
Address

**If entity Guarantor:**

_____

_____
Address

By: _____

By: _____

By: _____

By: _____

597302

BECKER COUNTY RECORDER
STATE OF MINNESOTA
**Document No. 597302**
May 11, 2012 at 9:33 AM
I hereby certify that the within
instrument was recorded in this office.
Darlene Maneval, County Recorder
By __SKS_____ Deputy

Registration Tax hereon of $ _805.00_
paid Receipt Number _503467_
_Ryan L. Jangen_
Becker County Auditor/Treasurer
By _____ _dm_ Deputy
_24-0144-001_

---

|||||  Community Development Bank usa

# COMMERCIAL MORTGAGE –
# AND ASSIGNMENT OF RENTS

☐ This mortgage is intended to secure only a portion of the debt amount:
Notwithstanding anything to the contrary herein, enforcement of this mortgage is limited to a debt amount of
$ 350,000.00 ____ under Chapter 287 of Minnesota Statutes.

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 8, 10, 15, 17 and 18. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated _____ May 7, 2012 _____, together with all Riders to this document.

**(B) "Borrower"** is: **Donald D. Tietz and Coleen J. Teitz, as husband and wife**
**23865 250th St**
**Detroit Lakes, MN  56501**

This shall be the address(es) for all notices required or permitted hereunder.

Borrower is the mortgagor under this Security Instrument.

**(C) "Lender"** is: **Community Development Bank, organized and existing under the laws of Minnesota**
**P.O. Box 38**
**Ogema, MN  56569**

Lender is the mortgagee under this Security Instrument.

**(D) "Note"** means the promissory note signed by Borrower and dated _____ May 7, 2012 _____. The Note states that Borrower owes Lender **Three Hundred Fifty Thousand and 00/100**
_____ Dollars (U.S. $350,000.00 _____) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than _____ May 5, 2022 _____.
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:
☐ Adjustable Rate Rider       ☐ Balloon Rider          ☐ Escrow Rider
☐ Other(s) [specify] _____
**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

Minnesota
© Creative Thinking, Inc. 2005                    Page 1 of 7
17450.CV (8/07)      CML58

chg
✓paid
well
non/std
extra

Initials _____

GOTO(00049b8a)

Ex C



**(K)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(L)** **"Periodic Payment"** means the regularly scheduled amount due for principal and interest under the Note.
**(M)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender:  (i) the repayment of the Loan for all amounts now outstanding or advanced hereafter, and all renewals, extensions and modifications of the Note; (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note; and (iii) all future advances made by Lender to protect its interests in the Property as provided herein; and (iv) all future advances not to exceed the sum of **$350,000.00**       made at the option of the parties with reference to or in reliance upon this Security Instrument to the fullest extent permitted by Applicable Law.  For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with power of sale, the following described property located in the _____**County**_____ of **Becker** _____:
                                                                    [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

SEE EXHIBIT A

which currently has the address of _____**23865 250th St**_____
                                                                                                                [Street]
____**Detroit Lakes**____ , Minnesota,    **56501**      ("Property Address"):
         [City]                                          [Zip Code]

        TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property" AND TOGETHER WITH all rents and profits therefrom, including all leases, subleases, and agreements for the use or occupancy of the Property, now existing or hereafter arising or renewed or extended, and all rents, security deposits, income and profits therefrom.
        **Assignment of Rents:** Borrower assigns to Lender and grants a security interest in all leases and rents arising from or related to the Property including, without limitation, all licenses, leases, contracts, or other agreements for the use and possession of real estate and all rights of income, rents, proceeds, issues, profits or other payment or benefit derived under any present and future lease.  Until default, Borrower shall be entitled to lease, rent or otherwise use said Property and to collect and use the rents and profits therefrom.  Upon default and thereafter, all rents collected by Borrower shall be held in trust for the benefit of and turn over to Lender and shall not be commingled with any other property or assets of Borrower or any other person.
        Upon default, Lender shall be entitled to: (a) notify any tenant to make payment of rents due or to become due directly to Lender; (b) collect rents and apply the same to the obligations secured hereby; (c) to execute such documents and do such acts and deeds as Borrower could to lease, re-lease, sub-lease or manage the Property; (d) to otherwise act to enforce any lease or rental agreement on the Property and to bring actions in the name of Borrower to enforce the terms of any lease, rental agreement of other right assigned hereunder; and (e) appointment of a receiver under Applicable Law to take possession of the Property and to collect the rents and profits from the Property and manage the same. To the extent permitted by Applicable Law, Borrower hereby indemnifies and agrees to hold Lender harmless from any and all claims, liabilities, costs and expenses arising from or related to lease or rental of the Property or any injuries thereupon.
        BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
        THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
        UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:
        **1.   Payment of Principal, Interest, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note.  Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
        Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12.  Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.  Lender may accept

any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Fees, and Assessments, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

4. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 19 or otherwise, Borrower hereby assigns to Lender (a) Borrower's

Minnesota
© Creative Thinking, Inc. 2005                                      Page 3 of 7                                      Initials _____
17450.CV (8/07)          CML58

GOTO(00049b8a)

rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**5.   Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property. Borrower shall not allow the Property to deteriorate or commit waste on the Property. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6.   Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

**7.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions may include, but are not limited to, the following: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8.   Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to borrower or the person or persons otherwise entitled thereto.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture

of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9.   Borrower Not Released; Forbearance By Lender Not a Waiver.**  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10.   Joint and Several Liability; Co-signers; Successors and Assigns Bound.**  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11.   Loan Charges.**  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection, and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**12.   Notices.**  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the address defined for Borrower unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13.   Governing Law; Severability; Rules of Construction.**  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14.   Borrower's Copy.**  Borrower shall be given one copy of the Note and of this Security Instrument.

**15.   Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**16.   Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as

Minnesota
© Creative Thinking, Inc. 2005
17450.CV (8/07)     CML58

Initials _DTC̸J̸_

GOTO(80049b8a)

Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection, and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 19 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property: (a) that is in violation of any Environmental Law; (b) which creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**19. Acceleration; Remedies.** Lender shall give notice to Borrower by certified mail to the address of the **Property or another address designated by Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 19, including, but not limited to, reasonable attorneys' fees.**

**If Lender invokes the power of sale, Lender shall cause a copy of a notice of sale to be served upon any person in possession of the Property. Lender shall publish a notice of sale, and the Property shall be sold at public auction in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**20. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

Minnesota

© Creative Thinking, Inc. 2005
17459.CV (8/07)    CML58

Initials _____

GOTO(00049b8a)

**21. Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

**22. Interest on Advances.** The interest rate on advances made by Lender under this Security Instrument shall not exceed the maximum rate allowed by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

By: _____    _____
                                Donald D. Tietz

By: _____    _____
                                Coleen J. Tietz

By: _____

By: _____

STATE OF Minnesota                    )
                                      ) ss:
COUNTY OF Becker                      )

This instrument was acknowledged before me on this **7th** day of **May**, **2012**, by **Donald D. Tietz and Coleen J. Tietz, as husband and wife**

_____

(known to me) (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the foregoing instrument and acknowledged that he/she/they executed the same.

(Seal, if any)                        _____
                                      Signature of notarial officer

MATTHEW T. BOEKE
Notary Public
Minnesota
My Commission Expires January 31, 2014

**Matthew T. Boeke, Loan Officer**
Name, Title (and Rank)

My Commission Expires: **January 31, 2014**

This instrument was drafted by:
                **Community Development Bank**
                **P.O. Box 38**
                **Ogema, MN  56569**

EXHIBIT A

That part of the Northeast Quarter of Section 19, Township 140 North, Range 41
West of the 5th Principal Meridian in Becker County, Minnesota, described as
follows:

Commencing at the northwest corner of said Northeast Quarter of Section
19; thence South 88 degrees 58 minutes 16 seconds East, assumed bearing
along the north line of said Northeast Quarter, a distance of 242.06 feet
to the point of beginning; said point of beginning being a point designated
as B-309 on the MINNESOTA DEPARTMENT OF TRANSPORTATION RIGHT-OF-WAY PLAT
No. 03-9 as the same is recorded at the office of the Becker County
Recorder; thence continue South 88 degrees 58 minutes 16 seconds East, along
said north line, a distance of 1715.22 feet; thence South 12 degrees25 minutes
47 seconds West 750.74 feet; thence South 00 degrees 03 minutes 58 seconds
West 901.68 feet; thence South 89 degrees 05 minutes 20 seconds West 474.48
feet; thence South 02 degrees 40 minutes 27 seconds West 872.54 feet; thence
South 87 degrees 25 minutes 06 seconds West 1070.25 feet to the east line of
said RIGHT-OF-WAY PLAT No. 03-9 (east boundary of Trunk Highway 59); thence
northerly 261.41 feet along the east line of said RIGHT-OF-WAY PLAT, along a
non-tangential curve, concave to the east, having a central angle of 00 degrees
26 minutes 13 seconds, a radius of 34,275.47 feet, and the chord of said
curve bears North 00 degrees 30 minutes 37 seconds East, to a point designated
as B-4 on said recorded plat; thence North 00 degrees 43 minutes 43 seconds
East, along said east plat line, on a line tangent to said curve, a distance
of 2331.76 feet to the point of beginning.   Containing 83.18 acres.

Subject to an easement for public road over, under, and across the north 33.00
feet of the above described tract. Also Subject to easements of record, if any.

AND

That part of the East Half of the Northeast Quarter of Section 19, Township 140 North, Range 41
West of the Fifth Principal Meridian in Becker County, Minnesota, described as follows:

Commencing at the northwest corner of the Northeast Quarter of said Section 19; thence
South 88 degrees 58 minutes 16 seconds East, assumed bearing along the north line of said
Section 19, for 1957.28 feet to the northeast corner of a certain tract as described in
Document Number 370141 at the Office of the Becker County Recorder; said point being the
point of beginning; thence South 12 degrees 25 minutes 47 seconds West, in the east
boundary of said tract, for 750.74 feet; thence South 00 degrees 03 minutes 58 seconds West,
in said east boundary, for 901.68 feet to a southeast corner of said tract; said southeast corner
herein after referred to as Point "A"; thence North 89 degrees 05 minutes 20 seconds East
5.00 feet; thence North 01 degree 07 minutes 08 seconds East, for 435.41 feet; thence South
89 degrees 56 minutes 02 seconds East for 67.00 feet; thence North 00 degrees 03 minutes
58 seconds East 691.12 feet; thence North 12 degrees 25 minutes 47 seconds East 520.02 feet
to the north line of said Section 19; thence North 88 degrees 58 minutes 16 seconds West,
along said north line, for 30.60 feet to the point of beginning.

Together with that part of the South Half of the Northeast Quarter of said Section 19, described as
follows:

Commencing at the above described Point "A"; thence South 89 degrees 05 minutes 20
seconds West, along a southerly boundary of the tract as described in said Document Number
370141, a distance of 259.48 feet to the point of beginning; thence continue South 89 degrees
05 minutes 20 seconds West, in said boundary, for 215.00 feet; thence South 02 degrees 40
minutes 27 seconds West, in said boundary, for 872.54 feet to the south line of said
boundary; thence North 04 degrees 34 minutes 27 seconds East 742.00 feet; thence North 07
degrees 53 minutes 45 seconds East 130.00 feet; thence North 87 degrees 52 minutes 54
seconds East 178.77 feet to the Point of Beginning.

Subject to an easement for road purposes along the most northerly boundary of the above described
tract.

<u>LESS:</u>

That part of the Southwest Quarter of the Northeast Quarter in Section 19, Township 140 North, Range 41 West of the Fifth Principal Meridian in Becker County, Minnesota, described as follows:

Commencing at a found cast iron monument which designates the north quarter corner of said Section 19; thence South 88 degrees 58 minutes 16 seconds East 242.06 feet on an assumed bearing along the north line of said Section 19 to a found iron monument which designates Right of Way Monument B903 according to the plat of MINNESOTA DEPARTMENT OF TRANSPORTATION RIGHT OF WAY PLAT NO. 03-9, said plat is on file and of record in the office of the Recorder of said County; thence South 00 degrees 43 minutes 43 seconds West 1843.82 feet along the easterly line of said plat to an iron monument, said point is the point of beginning; thence North 88 degrees 44 minutes 15 seconds East 403.43 feet to an iron monument; thence South 00 degrees 11 minutes 01 second West 348.19 feet to an iron monument; thence continuing South 00 degrees 11 minutes 01 second West 391.53 feet; thence South 87 degrees 25 minutes 06 seconds West 409.91 feet to a found iron monument on the easterly line of said plat; thence northerly along the easterly line of said plat on a curve concave to the east, having a central angle of 00 degrees 26 minutes 13 seconds and a radius of 34,275.47 feet, for a distance of 261.41 feet (chord bearing North 00 degrees 30 minutes 37 seconds East) to Right of Way Boundary Corner B-4; thence North 00 degrees 43 minutes 43 seconds East 487.94 feet continuing along the easterly line of said plat to the point of beginning.  The above described tract contains 6.95 acres.

## LOAN MODIFICATION AND FORBEARANCE AGREEMENT

This Agreement is made this 30TH day of April, 2016, by and among Community Development Bank (the "Bank"), Don Tietz Construction, Inc. ("Borrower"), and Donald D. Tietz and Jason Coley (collectively, "Guarantors").

### RECITALS

A.   <u>The Parties</u>.   The Bank is a Minnesota banking corporation with offices in Ogema, Minnesota.  The Borrower has a business address of 23865 250th Street, Detroit Lakes, MN 56501.  The Guarantors are officers of the Borrower.

B.   <u>The Credit Facility</u>.   The Borrower is indebted to the Bank under the following credit facility:

Loan No. ██████2137 – Promissory Note dated May 7, 2012 in the original principal amount of $350,000.00 (the "Loan").  As of April 14, 2016 the Loan is outstanding in the aggregate sum of $288,347.83 (principal of $260,674.48, interest of $22,925.60 and late charges of $4,747.75), together with further interest of $39.28 per day until paid.

The foregoing sum, together with accruing interest, costs and disbursements, including reasonable attorney's fees is sometimes hereafter collectively referred to as the "Existing Indebtedness."

C.   <u>The Collateral</u>.   The Existing Indebtedness is secured, in whole or in part, as follows:

(i)   A Security Agreement covering all business assets including but not limited to accounts, inventory, equipment, general intangibles, tools and other personal property assets (the "Personal Property Collateral"); and

(ii)   A Commercial Mortgage and Assignment of Rents covering certain real property found and located in Becker County, Minnesota and commonly known as 23865 250th Street, Detroit Lakes, MN 56501 (the "Real Property Collateral").

Signature lines for the respective spouses of the Guarantors are included in this Agreement by reason of the execution of the Security Agreement and Mortgage/Assignment of Rents by the spouses, Colleen J. Tietz and Amy M. Coley, as applicable.

D.   <u>The Guaranty</u>.   The Existing Indebtedness is absolutely and unconditionally guaranteed by the Guarantors.

E.   All of the documents creating or relating to the Existing Indebtedness including the Promissory Note, Commercial Loan Agreement, Security Agreement, Guaranty, Commercial Real Estate Mortgage/Assignment of Rents and other loan documents executed in connection therewith are referred to collectively herein as the "Existing Loan Documents."



F.      Borrower and Guarantors have interrelated financial concerns and commercial interests and the financing relating to one will have a direct and substantial economic effect on the other. Borrower and Guarantors will derive substantial benefit from the terms of this Agreement pertaining to the Existing Indebtedness.

G.      Borrower and Guarantors are in default of the Existing Indebtedness, having failed to make payments totaling $52,322.93 as of February 16, 2016 in order to bring the Loan current, among other things. The Borrower has represented that it is in the process of marketing its construction business for sale to pay the Existing Indebtedness in full. Borrower and Guarantors have requested that the Bank forbear from immediately exercising its rights and remedies under the Existing Loan Documents and applicable law in consideration of the terms and conditions set forth in this Agreement.

H.      The Bank is not obligated to grant any further extensions, renewals or forbearance with respect to the Existing Indebtedness or any part thereof.

I.      The non-bank parties each desire to induce the Bank to enter into this Agreement which has been negotiated among the parties.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, the parties agree as follows:

1.      Each of the Recitals is true and correct.

2.      Except as specifically otherwise agreed herein, (a) the terms of all of the Existing Loan Documents shall remain in full force and effect, and (b) the Bank retains all rights and remedies set forth in the Existing Loan Documents and at law.

3.      This Agreement shall not be construed (a) to apply to any loan other than the Loan described above, or (b) as an agreement by the Bank to extend any further credit of any nature whatsoever to or for the benefit of Borrower or Guarantors or to provide any further modifications or extensions beyond those expressly stated herein.

4.      Borrower and Guarantors each acknowledge that the Existing Loan Documents are valid and enforceable according to their terms and that Borrower and Guarantors, as applicable, are each unconditionally liable to the Bank for the repayment of the Existing Indebtedness; and that such liability, as of the date hereof, is not subject to any defense, setoff or counterclaim.

5.      Borrower and Guarantors further acknowledge that the Existing Lien Interests granted to the Bank are valid and perfected security interests in all of the collateral. They further warrant that such collateral is free of any other encumbrances and liens except as disclosed in writing by the Borrower and Guarantors to the Bank, or reflected in the record title.

6.      Subject to and conditioned upon full compliance by Borrower and Guarantors with all terms and conditions of this Agreement, the Bank agrees to forbear from enforcing its rights as a secured creditor until September 1, 2016 (the "Forbearance Period").

2

7.     Immediately upon execution of this Agreement, and thereafter as applicable, Borrower and Guarantors, as applicable, shall deliver to the Bank the following:

(a)     Evidence in form and substance satisfactory to the Bank that insurance on all of the Personal Property Collateral and Real Estate Collateral is and remains in full force and effect during the term of this Agreement;

(b)     Assignment in form and substance acceptable to the Bank of Northwestern Mutual Life Insurance Policy No. ____3910____ insuring the life of Donald D. Tietz, in favor of the Bank as additional collateral to secure the Existing Indebtedness;

(c)     A true copy of the Borrower's listing agreement, if any, relating to the sale of the business of Borrower, and thereafter, a copy of any purchase agreement as soon as practicable;

(d)     All reporting requirements as provided for in the Existing Loan Documents; and

(e)     Progress reports for all work in process on the part of Borrower.

Borrower and the Guarantors agree to supplement the foregoing reporting requirements on not less than a monthly basis during the term of this Agreement.

8.     During the term of this Agreement, Borrower agrees to make monthly interest payments on the Loan at the times and in such manner as otherwise provided for under the Existing Loan Documents.

9.     By not later than May 2, 2016, Borrower and/or Donald D. Tietz shall pay to the Bank a sum of not less than $41,000.00, which Donald D. Tietz represents to be loan proceeds from the Northwestern Mutual Life Insurance Policy described above, and which shall be applied to the Existing Indebtedness first to interest, then to late charges and the balance to principal of the Loan. The Bank acknowledges that the assignment is for collateral purposes only and that upon payment in full of the Existing Indebtedness, the assignment and all other collateral interests shall be released or satisfied.

10.     Borrower shall provide to the Bank by not later than September 1, 2016 a bona fide executed Purchase Agreement on Borrower's business sufficient to pay all lien creditors in full out of the proceeds thereof with closing to occur by not later than November 1, 2016. Upon delivery of a Purchase Agreement meeting the foregoing terms and conditions, the Bank agrees to extend the Forbearance Period under this Agreement to not later than November 1, 2016.

11.     In the event of a further default under the Existing Loan Documents, or in the event of a default under this Agreement, the Bank shall be entitled to immediately exercise its rights and remedies under the Existing Loan Documents and this Agreement. The occurrence of a default described in any of the Existing Loan Documents and in any of the documents executed in connection with this Agreement shall be a default under this Agreement. In addition, this Agreement shall be in default upon the occurrence of any of the following:

3

(a)    Breach of any of the material promises, covenants and undertakings herein contained; and

(b)    Any occurrence or non-occurrence, including but not limited to un-remedied material adverse changes in the financial circumstances of the Borrower or Guarantors, which the Bank reasonably deems to materially impair the prospect of punctual performance under this Agreement or any of the Existing Loan Documents.

12.    No failure or delay by the Bank in exercising any rights, powers or remedies under this Agreement or the Existing Loan Documents shall be a waiver thereof; in particular, acceptance by the Bank of any partial performance by the Borrower or Guarantors as to any duty of performance owed by the Borrower or Guarantors to the Bank shall not operate to impair the Bank's rights to obtain or demand full performance thereof. Further, this Agreement shall not constitute an election of remedies by the Bank, nor does the Bank waive any of its rights or remedies under the Existing Loan Documents and at law.

13.    The Borrower and Guarantors hereby release the Bank from any and all claims and causes of action that they may have against the Bank on the date hereof arising out of or in connection with any matter or thing relating to or occurring in connection with the Existing Indebtedness, including but not limited to, the administration of the Loan and all acts or omissions relating thereto, and also including but not limited to the extension or denial of credit to the Borrower. This release binds and inures to the benefit of the Bank, its affiliates and holding company, and its and their respective officers, directors, shareholders, employees, agents and attorneys.

14.    The Existing Loan Documents, this Agreement and any documents executed in connection with this Agreement represent the entire agreement between the parties relative to the subject matter hereof, which cannot be modified except in writing. There are no oral side agreements between the parties.

15.    It is the specific intention of the parties that their relationship is solely that of debtor and creditor and nothing herein shall be construed as creating a partnership, joint venture or other association between the parties. The Bank has not and will not in any way participate in or control the operation and conduct of the non-bank parties.

16.    The non-bank parties have each obtained such legal and tax counsel as they deem appropriate before entering into this Agreement and have independently determined to enter into this Agreement.

17.    Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions of this Agreement.

18.    The non-bank parties agree to execute all documents necessary to effectuate the terms of this Agreement.

4

19.    This Agreement shall be construed under the laws of the State of Minnesota.

Community Development Bank

By:    _____

Its:    _____

Don Tietz Construction, Inc.

By:    _____
Donald D. Tietz

Its:    PRESIDENT

_____
Donald D. Tietz

_____
Jason Coley

CONSENTED AND AGREED TO:

_____
Colleen J. Tietz

_____
Amy M. Coley

5

19. This Agreement shall be construed under the laws of the State of Minnesota.

Community Development Bank

By: _____

Its: _____President_____

Don Tietz Construction, Inc.

By: _____
Donald D. Tietz

Its: _____


_____
Donald D. Tietz


_____
Jason Coley


CONSENTED AND AGREED TO:


_____
Colleen J. Tietz


_____
Amy M. Coley

5

# AMENDMENT TO LOAN MODIFICATION AND FORBEARANCE AGREEMENT

This Amendment made this _____ day of October, 2016, amends the certain Loan Modification and Forbearance Agreement dated April 30, 2016 (the "Agreement"), by and among Community Development Bank (the "Bank"), Don Tietz Construction, Inc. ("Borrower"), and Donald D. Tietz and Jason Coley (collectively, "Guarantors").

## RECITALS

A.    Borrower, Guarantors and the Bank are the parties to the Agreement. By reason of execution of the Security Agreement and Mortgage/Assignment of Rents relating to the Real Property Collateral as further defined in the Agreement, Colleen J. Tietz and Amy M. Coley consented and agreed to the Agreement.

B.    Borrower and Guarantors have partially completed the terms and conditions of the Agreement, most recently having liquidated a substantial portion of the Real Property Collateral resulting in a payment application and debt reduction of $188,017.63 against the Existing Indebtedness as further defined in the Agreement. In consideration of the payment, the Bank has released all of the Real Property Collateral except that portion further described in Exhibit A attached to this Amendment. As of October 24, 2016 there remains due and owing to the Bank the sum of $61,098.18 in principal, interest and late charges, as well as further interest of $4.24 per day until paid, and the Bank's costs and disbursements including reasonable attorney's fees (the "Remaining Existing Indebtedness").

C.    Borrower and Guarantors have requested additional time from the Bank in order to liquidate the Personal Property Collateral and to pay off the Remaining Existing Indebtedness. As a result, Borrower and Guarantors have requested that the Bank consider an amendment to the Agreement which the Bank has agreed to in accordance with the terms and conditions set forth herein.

D.    Except as specifically provided for in this Amendment, all other terms and conditions of the Agreement shall remain in full force and effect.

**NOW, THEREFORE,** the Agreement is hereby amended as follows:

1.    Each of the Recitals is true and correct.

2.    Except as specifically otherwise agreed herein, (a) the terms of the Agreement shall remain in full force and effect, and (b) the Bank retains all rights and remedies set forth in the Agreement and at law.

3.    The Forbearance Period provided for at paragraphs 6 and 10 of the Agreement is extended to May 1, 2017. If not paid earlier, the Remaining Existing Indebtedness shall be due and payable in full on May 1, 2017.

4.    Commencing November 1, 2016 and thereafter on or before the first day of each month through and including April 1, 2017, Borrower shall make payments to the Bank of

Ex E

$1,100.00 per month for application against the Remaining Existing Indebtedness in such manner as the Bank in its sole discretion may determine. In addition, Borrower shall pay to the Bank 50% of any down payment immediately upon receipt of the down payment from any buyer of the Personal Property Collateral and related business of the Borrower. Further, to the extent that there is any Remaining Existing Indebtedness due the Bank as of May 1, 2017, Borrower and/or Donald D. Tietz shall immediately pay to the Bank the Remaining Existing Indebtedness from the cash value of Northwestern Mutual Life Insurance Policy No. ████3910 insuring the life of Donald D. Tietz (and subject to Assignment in favor of the Bank) and/or the proceeds of sale of the Personal Property Collateral and related business of Borrower. Borrower and Guarantors shall remain responsible for any deficiency which shall be immediately due and payable in full on May 1, 2017.

5.      Borrower and Guarantors agree to execute such other documents as are necessary to effectuate the terms of this Amendment.

6.      Borrower and Guarantors acknowledge and agree that this Amendment was negotiated by the parties in good faith and is a fair and reasonable agreement and is entered into of their own free will. They further acknowledge and agree that they have been provided the opportunity to and have obtained such legal counsel as they deem appropriate before entering into this Amendment. They further acknowledge and agree that there may be tax consequences to them arising out of the transactions contemplated by this Amendment and that they shall be responsible for any and all tax liabilities accruing as a result thereof, and that the Bank shall not be responsible in any manner for such tax liabilities, if any.

7.      No failure or delay by the Bank in exercising any rights, powers or remedies under this Amendment or the Existing Loan Documents shall be a waiver thereof; in particular, acceptance by the Bank of any partial performance by the Borrower and Guarantors as to any duty of performance owed by the Borrower and Guarantors to the Bank shall not operate to impair the Bank's rights to obtain or demand full performance thereof. Further, this Amendment shall not constitute an election of remedies by the Bank, nor does the Bank waive any of its rights or remedies under the Existing Loan Documents and at law.

8.      The Borrower and Guarantors hereby release the Bank from any and all claims and causes of action that they may have against the Bank on the date hereof arising out of or in connection with any matter or thing relating to or occurring in connection with the Existing and Remaining Existing Indebtedness, including but not limited to, the administration of the loan, and all acts or omissions related thereto, and also including but not limited to, the extension or denial of credit to the Borrower and Guarantors. This release binds and inures to the benefit of the Bank, its affiliates and holding company, and its and their respective officers, directors, shareholders, employees, agents and attorneys.

9.      There are no oral side agreements between the Borrower, Guarantors and the Bank; this Amendment and any documents executed in connection with this Amendment represent the entire agreement between the parties relative to the subject matter hereof, which cannot be modified except in writing.

2

10.    Any provision of this Amendment which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions of this Amendment.

11.    This Amendment shall be construed under the laws of the State of Minnesota.

Community Development Bank

By: _____

Its: _____President_____

Don Tietz Construction, Inc.

By: _____
Donald D. Tietz

Its: _____

_____
Donald D. Tietz

_____
Jason Coley

CONSENTED AND AGREED TO:

_____
Colleen J. Tietz

_____
Amy M. Coley

JESSICA L. SCHNEIBEL
NOTARY PUBLIC—MINNESOTA
My Commission Expires JAN. 31 2021

_____
1·31·21

3

EX A

Tietz:

That part of the Northeast Quarter of Section 19, Township 140 North, Range 41 West of the 5th
Principal Meridian in Becker County, Minnesota, described as follows:  Commencing at the
northwest corner of said Northeast Quarter of Section 19; thence South 88 degrees 58 minutes 16
seconds East, assumed bearing along the north line of said Northeast Quarter, a distance of
242.06 feet to a point designated as B-309 on the MINNESOTA DEPARTMENT OF
TRANSPORTATION RIGHT-OF-WAY PLAT No. 03-9 as the same is recorded at the office of
the Becker County Recorder; thence South 00 degrees 43 minutes 43 seconds West 550.00 feet
along the east line of said plat to a point, said point is the point of beginning; thence South 00
degrees 43 minutes 43 seconds West 1293.82 feet along the easterly line of said plat to an iron
monument; thence North 88 degrees 44 minutes 15 seconds East 403.43 feet, along the north line
of the real estate conveyed to George Scherzer and Carol Scherzer in the Warranty Deed
recorded as Document No. 463599, to an iron monument; thence North parallel with the easterly
line of said plat 1293.82 feet to a point located 403.46 feet East of the easterly line of said plat;
thence West parallel with the north line of said Northeast Quarter 403.46 feet more or less to the
point of beginning and there terminating.

N

Scale: 1 Inch ≈ 326 Feet
Area: 11.775 Acres (512,915.80 Square Feet)



1. S88°58'16"E  242.06'
2. S00°43'43"W  550'
3. S00°43'43"W  1293.82'
4. N88°44'15"E  403.43'
5. N  1293.82'
6. W  403.46'
7. To POB

Form No. 10 – Life Insurance Assignment
Form based on the
American Bankers Association Form 10
Bank Management Commission

## ASSIGNMENT OF LIFE INSURANCE POLICY AS COLLATERAL

**A.**    **For Value Received** the undersigned hereby assign, transfer and set over to  Community Development

Bank

**To the attention of**  Dale Sandahl

**Address:**  PO Box 38, Ogema, MN 56569

its successors and assigns, (herein called the "Assignee") Policy No(s).  ▮▮3910

issued by **THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY** (herein called the "Insurer")

and any supplementary contracts issued in connection therewith (said policy and contracts being herein called the "Policy"),

upon the life of  **Donald D. Tietz**

of  **23865 250th St., Detroit Lakes, MN 56501**              and all claims, options, privileges, rights, title and interest therein and thereunder (except as provided in paragraph C hereof), subject to all the terms and conditions of the Policy and to all superior liens, if any, which the Insurer may have against the Policy. The undersigned by this instrument jointly and severally agree and the Assignee by the acceptance of this assignment agrees to the conditions and provisions herein set forth.

**B.**    It is expressly agreed that, without detracting from the generality of the foregoing, the following specific rights are included in this assignment and pass by virtue hereof:

1.    The sole right to collect from the Insurer the net proceeds of the Policy when it becomes a claim by death or maturity;

2.    The sole right to surrender the Policy and receive the surrender value thereof at any time provided by the terms of the Policy and at such other times as the Insurer may allow;

3.    The sole right to obtain one or more loans or advances on the Policy, either from the Insurer, or at any time, from other persons, and to pledge or assign the Policy as security for such loans or advances;

4.    The sole right to collect and receive all distributions or shares of surplus, dividend deposits or additions to the Policy now or hereafter made or apportioned thereto, and to exercise any and all options contained in the Policy with respect thereto; provided, that unless and until the Assignee will notify the Insurer in writing to the contrary, the distributions or shares of surplus, dividend deposits and additions will continue on the plan in force at the time of this assignment; and

5.    The sole right to exercise all nonforfeiture rights permitted by the terms of the Policy or allowed by the Insurer and to receive all benefits and advantages derived therefrom.

**C.**    It is expressly agreed that the following specific rights, so long as the Policy has not been surrendered, are reserved and excluded from this assignment and do not pass by virtue hereof:

1.    The right to collect from the Insurer any disability benefit payable in cash that does not reduce the amount of insurance;

2.    The right to designate and change the beneficiary;

3.    The right to elect any optional mode of settlement permitted by the Policy or allowed by the Insurer; but the reservation of these rights will in no way impair the right of the Assignee to surrender the Policy completely with all its incidents or impair any other right of the Assignee hereunder, and any designation or change of beneficiary or election of a mode of settlement will be made subject to this assignment and to the rights of the Assignee hereunder.

**D.**    This assignment is made and the Policy is to be held as collateral security for any and all liabilities of the undersigned, or any of them, to the Assignee, either now existing or that may hereafter arise in the ordinary course of business between any of the undersigned and the Assignee (all of which liabilities secured or to become secured are herein called "Liabilities").

**E.**    The Assignee covenants and agrees with the undersigned as follows:

1.    That any balance of sums received hereunder from the Insurer remaining after payment of the then existing Liabilities, matured or unmatured, will be paid by the Assignee to the persons entitled thereto under the terms of the Policy had this assignment not been executed.

2.    That the Assignee will not exercise either the right to surrender the Policy or (except for the purpose of paying premiums) the right to obtain policy loans from the Insurer, until there has been default in any of the Liabilities or a failure to pay any premium when due, nor until twenty days after the Assignee will have mailed, by first class mail, to the undersigned at the addresses last supplied in writing to the Assignee specifically, referring to this assignment, notice of intention to exercise such right; and

3.    That the Assignee will upon request forward without unreasonable delay to the Insurer the Policy for endorsement of any designation or change of beneficiary or any election of an optional mode of settlement.

90-0254ABA (0414)

F&L fe

EX F

Policy Number(s): _____ ████3910 _____

F.   The Insurer is hereby authorized to recognize the Assignee's claims to rights hereunder without investigating the reason for any action taken by the Assignee, or the validity or the amount of the Liabilities or the existence of any default herein, or the giving of any notice under paragraph E(2) above or otherwise, or the application to be made by the Assignee of any amounts to be paid to the Assignee. The sole signature of the Assignee will be sufficient for the exercise of any rights under the Policy assigned hereby and the sole receipt of the Assignee for any sums received will be a full discharge and release therefore to the Insurer. Checks for all or any part of the sums payable under the Policy and assigned herein, will be drawn to the exclusive order of the Assignee if, when, and in such amounts may be, requested by the Assignee.

G.   The Assignee will be under no obligation to pay any premium, or the principal of or interest on any loans or advances on the Policy whether or not obtained by the Assignee, or any other charges on the Policy, but any such amounts so paid by the Assignee from its own funds, will become a part of the Liabilities hereby secured, will be due immediately, and will draw interest at a rate fixed by the Assignee from time to time not exceeding 6% per annum.

H.   The exercise of any right, option, privilege or power given herein to the Assignee will be at the option of the Assignee, but (except as restricted by paragraph E(2) above) the Assignee may exercise any such right, option, privilege or power without notice to, or assent by, or affecting the liability of, or releasing any interest hereby assigned by the undersigned, or any of them.

I.   The Assignee may take or release other security, may release any party primarily or secondarily liable for any of the Liabilities, may grant extensions, renewals or indulgences with respect to the Liabilities or may apply to the Liabilities in such order as the Assignee will determine, the proceeds of the Policy hereby assigned or any amount received on account of the Policy by the exercise of any right permitted under this assignment, without resorting or regard to other security.

J.   In the event of any conflict between the provisions of this assignment and provisions of the note or other evidence of any Liability, with respect to the Policy or rights of collateral security therein, the provisions of this assignment will prevail.

K.   Each of the undersigned declares that no proceedings in bankruptcy are pending against him or her and that his or her property is not subject to any assignment for the benefit of creditors.

| SIGNATURE(S) OF OWNER(S) | | |
|---|---|---|
| **PERSONAL OWNER(S)** | | |
| *Donald P* | | 5-2-16 |
| SIGNATURE | SIGNATURE | DATE SIGNED (MM/DD/YYY) |
| | | |
| SIGNATURE | SIGNATURE | DATE SIGNED (MM/DD/YYY) |
| **BUSINESS/ENTITY OWNER** | | |
| PRINT NAME OF BUSINESS/ENTITY: | | |
| | | |
| SIGNATURE OF AUTHORIZED COMPANY REPRESENTATIVE | | DATE SIGNED (MM/DD/YYYY) |
| **TRUST OWNER** | | |
| PRINT NAME OF TRUST: | | |
| | | |
| SIGNATURE OF AUTHORIZED TRUSTEE(S) | SIGNATURE OF AUTHORIZED TRUSTEE(S) | DATE SIGNED (MM/DD/YYYY) |
| ◆ IF THE BENEFICIARY OF THE POLICY(IES) IS IRREVOCABLE, THE BENEFICIARY(IES) MUST SIGN THIS FORM ◆ | | |
| IRREVOCABLE BENEFICIARY SIGNATURE(S) | | |
| | | |
| SIGNATURE | SIGNATURE | |

F&Lfe

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

_____

In Re:

Donald Tietz                                                        Bankruptcy No. 17-60377-MER
Coleen Tietz,                                                       Chapter 7

       Debtors.

_____

## MEMORANDUM IN SUPPORT OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY

### Facts

Community Development Bank (the "Bank") is the holder of a claim secured by an assignment of insurance and real property of the Debtors. The Bank has not been provided with adequate protection of its interest in the collateral. The underlying indebtedness is in default. Cause exists for lifting the automatic stay. In addition, although the Debtors have equity in the property, the property is not necessary for the Debtor's reorganization, this being a Chapter 7 case.

### Argument

Pursuant to 11 U.S.C. § 362(d) (1) of the Bankruptcy Code, a creditor is entitled to relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such (creditor)." No adequate protection has been provided to the Bank relative to its interest in the collateral. Pursuant to 11 U.S.C. § 362(d) (2) of the Bankruptcy Code, stay relief is also appropriate where as in this case, the property is not necessary to an effective reorganization.

As a consequence, relief from the automatic stay should be granted so the Bank can proceed to enforce its lien interests in the property.

Dated this 16th day of April, 2018.

JONATHAN FAY, P.C.

By:    /e/  Jonathan R. Fay
Jonathan R. Fay, ID #173721
P.O. Box 764
Detroit Lakes, MN 56502-0764
(701) 293-9190
jack@jfaylaw.com
Attorneys for Community Development
Bank

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

_____

In Re:

Donald Tietz                                    Bankruptcy No. 17-60377-MER
Coleen Tietz,                                   Chapter 7

      Debtors.

_____

## AFFIDAVIT OF SERVICE

STATE OF NORTH DAKOTA     )
                             ) SS:
COUNTY OF CASS               )

      Tricia A. Fossen, being first duly sworn on oath deposes and says that she is a secretary in the office of Jonathan Fay, P.C; that on the 16th day of April, 2018, she caused copies of the following documents to be filed with the Court's CM/ECF system, which provides service to all counsel of record by electronic mail:

**NOTICE OF HEARING AND MOTION FOR RELIEF FROM AUTOMATIC STAY**

**MEMORANDUM IN SUPPORT OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

**ORDER GRANTING RELIEF FROM STAY [PROPOSED]**

I further certify that on April 16, 2018, I caused copies of the foregoing documents to be served on the following via U.S. Mail:

      Donald Tietz
      Coleen Tietz
      PO Box 5
      Callaway, MN 56521

and the envelope with postage prepaid was deposited by her in the United States Mail at Fargo, North Dakota, for delivery by the United States Post Office Department as directed by said envelope.

                          /e/  Tricia A. Fossen _____
                          Tricia A. Fossen

Subscribed and sworn to before me this 16th day of April, 2018.

                          /e/  Michelle M. Hallman _____
                          Notary Public

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

_____

In Re:

Donald Tietz                                          Bankruptcy No. 17-60377-MER
Coleen Tietz,                                         Chapter 7

      Debtors.

_____

**ORDER GRANTING RELIEF FROM STAY**

      The above matter came before the Court on May 1, 2018, on the Motion of Community

Development Bank for relief from the automatic stay imposed by 11 U.S.C. § 362(a).

      Based on the record, the Court finds that grounds exist under 11 U.S.C. § 362(d) to

warrant relief.

      **IT IS HEREBY ORDERED**:

1.      The Motion for Relief from Stay is granted as follows.

2.      The automatic stay imposed by 11 U.S.C. § 362(a) is terminated such that the Movant Community Development Bank may exercise its rights and remedies under applicable non-bankruptcy law with respect to the following property:

      \*\*See attached Exhibit A
      And,
      Assignment of The Northwestern Mutual Life Insurance Company Policy No. \*\*\*\*3910

3.      Notwithstanding Fed. R. Bankr. P. 4001(a)(3), this Order is effective immediately.

Dated this _____ day of _____, 2018.


                                 _____
                                 Michael E. Ridgway
                                 United States Bankruptcy Judge

Tietz:

That part of the Northeast Quarter of Section 19, Township 140 North, Range 41 West of the 5th
Principal Meridian in Becker County, Minnesota, described as follows:  Commencing at the
northwest corner of said Northeast Quarter of Section 19; thence South 88 degrees 58 minutes 16
seconds East, assumed bearing along the north line of said Northeast Quarter, a distance of
242.06 feet to a point designated as B-309 on the MINNESOTA DEPARTMENT OF
TRANSPORTATION RIGHT-OF-WAY PLAT No. 03-9 as the same is recorded at the office of
the Becker County Recorder; thence South 00 degrees 43 minutes 43 seconds West 550.00 feet
along the east line of said plat to a point, said point is the point of beginning; thence South 00
degrees 43 minutes 43 seconds West 1293.82 feet along the easterly line of said plat to an iron
monument; thence North 88 degrees 44 minutes 15 seconds East 403.43 feet, along the north line
of the real estate conveyed to George Scherzer and Carol Scherzer in the Warranty Deed
recorded as Document No. 463599, to an iron monument; thence North parallel with the easterly
line of said plat 1293.82 feet to a point located 403.46 feet East of the easterly line of said plat;
thence West parallel with the north line of said Northeast Quarter 403.46 feet more or less to the
point of beginning and there terminating.

N

Scale: 1 Inch = 326 Feet
Area: 11.775 Acres (512,915.80 Square Feet)



1. S88°58'16"E  242.06'
2. S00°43'43"W  550'
3. S00°43'43"W  1293.82'
4. N88°44'15"E  403.43'
5. N  1293.82'
6. W  403.46'
7. To POB

Form No. 10 – Life Insurance Assignment
Form based on the
American Bankers Association Form 10
Bank Management Commission

# ASSIGNMENT OF LIFE INSURANCE POLICY AS COLLATERAL

**A.** **For Value Received** the undersigned hereby assign, transfer and set over to  Community Development

Bank

**To the attention of**  Dale Sandahl

**Address:**  PO Box 38, Ogema, MN 56569

its successors and assigns, (herein called the "Assignee") Policy No(s).  ████3910

issued by **THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY** (herein called the "Insurer")
and any supplementary contracts issued in connection therewith (said policy and contracts being herein called the "Policy"),
upon the life of  **Donald D. Tietz**

of  **23865 250ᵗʰ St., Detroit Lakes, MN 56501**              and all claims, options, privileges, rights, title and interest therein
and thereunder (except as provided in paragraph C hereof), subject to all the terms and conditions of the Policy and to all superior
liens, if any, which the Insurer may have against the Policy. The undersigned by this instrument jointly and severally agree and the
Assignee by the acceptance of this assignment agrees to the conditions and provisions herein set forth.

**B.**    It is expressly agreed that, without detracting from the generality of the foregoing, the following specific rights are included in this
assignment and pass by virtue hereof:

1.   The sole right to collect from the Insurer the net proceeds of the Policy when it becomes a claim by death or maturity;

2.   The sole right to surrender the Policy and receive the surrender value thereof at any time provided by the terms of the
Policy and at such other times as the Insurer may allow;

3.   The sole right to obtain one or more loans or advances on the Policy, either from the Insurer, or at any time, from other
persons, and to pledge or assign the Policy as security for such loans or advances;

4.   The sole right to collect and receive all distributions or shares of surplus, dividend deposits or additions to the Policy now or
hereafter made or apportioned thereto, and to exercise any and all options contained in the Policy with respect thereto;
provided, that unless and until the Assignee will notify the Insurer in writing to the contrary, the distributions or shares of
surplus, dividend deposits and additions will continue on the plan in force at the time of this assignment; and

5.   The sole right to exercise all nonforfeiture rights permitted by the terms of the Policy or allowed by the Insurer and to
receive all benefits and advantages derived therefrom.

**C.**    It is expressly agreed that the following specific rights, so long as the Policy has not been surrendered, are reserved and excluded
from this assignment and do not pass by virtue hereof:

1.   The right to collect from the Insurer any disability benefit payable in cash that does not reduce the amount of insurance;

2.   The right to designate and change the beneficiary;

3.   The right to elect any optional mode of settlement permitted by the Policy or allowed by the Insurer; but the reservation of
these rights will in no way impair the right of the Assignee to surrender the Policy completely with all its incidents or impair
any other right of the Assignee hereunder, and any designation or change of beneficiary or election of a mode of settlement
will be made subject to this assignment and to the rights of the Assignee hereunder.

**D.**    This assignment is made and the Policy is to be held as collateral security for any and all liabilities of the undersigned, or any
of them, to the Assignee, either now existing or that may hereafter arise in the ordinary course of business between any of the
undersigned and the Assignee (all of which liabilities secured or to become secured are herein called "Liabilities").

**E.**    The Assignee covenants and agrees with the undersigned as follows:

1.   That any balance of sums received hereunder from the Insurer remaining after payment of the then existing Liabilities,
matured or unmatured, will be paid by the Assignee to the persons entitled thereto under the terms of the Policy had this
assignment not been executed.

2.   That the Assignee will not exercise either the right to surrender the Policy or (except for the purpose of paying premiums)
the right to obtain policy loans from the Insurer, until there has been default in any of the Liabilities or a failure to pay any
premium when due, nor until twenty days after the Assignee will have mailed, by first class mail, to the undersigned at the
addresses last supplied in writing to the Assignee specifically, referring to this assignment, notice of intention to exercise
such right; and

3.   That the Assignee will upon request forward without unreasonable delay to the Insurer the Policy for endorsement of any
designation or change of beneficiary or any election of an optional mode of settlement.

90-0254ABA (0414)

F&L fe

Policy Number(s): _____ ███3910 _____

F.    The Insurer is hereby authorized to recognize the Assignee's claims to rights hereunder without investigating the reason for any action taken by the Assignee, or the validity or the amount of the Liabilities or the existence of any default herein, or the giving of any notice under paragraph E(2) above or otherwise, or the application to be made by the Assignee of any amounts to be paid to the Assignee. The sole signature of the Assignee will be sufficient for the exercise of any rights under the Policy assigned hereby and the sole receipt of the Assignee for any sums received will be a full discharge and release therefore to the Insurer. Checks for all or any part of the sums payable under the Policy and assigned herein, will be drawn to the exclusive order of the Assignee if, when, and in such amounts may be, requested by the Assignee.

G.    The Assignee will be under no obligation to pay any premium, or the principal of or interest on any loans or advances on the Policy whether or not obtained by the Assignee, or any other charges on the Policy, but any such amounts so paid by the Assignee from its own funds, will become a part of the Liabilities hereby secured, will be due immediately, and will draw interest at a rate fixed by the Assignee from time to time not exceeding 6% per annum.

H.    The exercise of any right, option, privilege or power given herein to the Assignee will be at the option of the Assignee, but (except as restricted by paragraph E(2) above) the Assignee may exercise any such right, option, privilege or power without notice to, or assent by, or affecting the liability of, or releasing any interest hereby assigned by the undersigned, or any of them.

I.    The Assignee may take or release other security, may release any party primarily or secondarily liable for any of the Liabilities, may grant extensions, renewals or indulgences with respect to the Liabilities or may apply to the Liabilities in such order as the Assignee will determine, the proceeds of the Policy hereby assigned or any amount received on account of the Policy by the exercise of any right permitted under this assignment, without resorting or regard to other security.

J.    In the event of any conflict between the provisions of this assignment and provisions of the note or other evidence of any Liability, with respect to the Policy or rights of collateral security therein, the provisions of this assignment will prevail.

K.    Each of the undersigned declares that no proceedings in bankruptcy are pending against him or her and that his or her property is not subject to any assignment for the benefit of creditors.

| SIGNATURE(S) OF OWNER(S) | | |
|---|---|---|
| **PERSONAL OWNER(S)** | | |
| _Donald M_ | | _5-2-16_ |
| SIGNATURE | SIGNATURE | DATE SIGNED (MM/DD/YYYY) |
| SIGNATURE | SIGNATURE | DATE SIGNED (MM/DD/YYYY) |
| **BUSINESS/ENTITY OWNER** | | |
| PRINT NAME OF BUSINESS/ENTITY: | | |
| SIGNATURE OF AUTHORIZED COMPANY REPRESENTATIVE | | DATE SIGNED (MM/DD/YYYY) |
| **TRUST OWNER** | | |
| PRINT NAME OF TRUST: | | |
| SIGNATURE OF AUTHORIZED TRUSTEE(S) | SIGNATURE OF AUTHORIZED TRUSTEE(S) | DATE SIGNED (MM/DD/YYYY) |

| ◆ IF THE BENEFICIARY OF THE POLICY(IES) IS IRREVOCABLE, THE BENEFICIARY(IES) MUST SIGN THIS FORM ◆ |
|---|
| IRREVOCABLE BENEFICIARY SIGNATURE(S) |
| SIGNATURE                    SIGNATURE |